PEOPLE v KETZNER

OPINION OF THE COURT

1. CRIMINAL LAW—APPEAL AND ERROR.

A conviction should be affirmed where a review of the whole record does not suggest that the defendant did not have a fair trial or that he was in any way denied due process (MCLA 769.26; GCR 1963, 529.1).

CONCURRENCE BY HOLBROOK, J.

2. SEARCHES AND SEIZURES—CRIMINAL LAW—EVIDENCE—MOTION TO SUPPRESS—PRESERVING QUESTION.

*The claim that certain articles of clothing were illegally seized and should not have been admitted into evidence at trial has not been preserved for appeal where the issue is raised for the first time on appeal, no motion to suppress was made before trial, and no objection was made to the admission of the articles at trial.*

3. CRIMINAL LAW—ASSISTANCE OF COUNSEL—EFFECTIVE ASSISTANCE— APPEAL AND ERROR.

*The Court of Appeals does not second guess trial counsel's strategy and tactics and it cannot be said that failure to file a motion to suppress certain articles of defendant's clothing was an act of incompetence of trial counsel where the evidence disclosed that the defendant gave his gloves to the police voluntarily, the gloves were the only article with blood on them that matched the blood type of the victim, and the evidence concerning blood on other clothing was consistent with defendant's claims.*

REFERENCES FOR POINTS IN HEADNOTES
[1] 21 Am Jur 2d, Criminal Law §§ 220–228, 234–240.
[2, 4] 5 Am Jur 2d, Appeal and Error § 545 *et seq.*
47 Am Jur, Searches and Seizures § 54.
[3] 5 Am Jur 2d, Appeal and Error §§ 545 *et seq.,* 895, 896.
[5] 5 Am Jur 2d, Appeal and Error §§ 545 *et seq.,* 624.
[6] 21 Am Jur 2d, Criminal Law § 240.
[7] 21 Am Jur 2d, Criminal Law §§ 820, 880–887.

4. CRIMINAL LAW—RES GESTAE WITNESSES—INDORSEMENT—PRESERV-
    ING QUESTION.

   *The failure of a defendant to move for the indorsement of known
    res gestae witnesses at trial precludes the issue being consid-
    ered on appeal for the first time.*

5. CRIMINAL LAW—PROSECUTOR'S REMARKS—PREJUDICE—PRESERVING
    QUESTION.

   *The issue of a prosecutor's prejudicial remarks to the jury in his
    closing argument is not preserved for appeal where the re-
    marks were in reference to an inference claimed to be justified
    by the evidence and where the defendant made only a single
    objection to the closing argument of the prosecutor and asked
    only that the prosecutor be instructed to refrain from such
    argument in the future and made no request for a mistrial or
    for a curative instruction.*

6. CRIMINAL LAW—TRIAL—DETENTION AND CUSTODY—PREJUDICIAL
    CONDUCT.

   *It was not reversible error for an armed guard to sit at the
    defense table during the defense's final argument where (1)
    defendant was on trial for murder, (2) there was just one
    unobtrusive officer at the defense table, and (3) the trial court
    had good reason for believing the presence of the armed guard
    was necessary.*

7. HOMICIDE—MURDER—EVIDENCE—ADMISSIBILITY.

   *Evidence was not so remote and speculative as to be inadmissible
    at defendant's trial for murder where the evidence was of
    money found in a mailbox, the killing was accompanied by a
    robbery of money, the fingerprints of defendant's wife and an
    employee of the restaurant in which the crime was committed
    were identified on the money, and defendant and his wife had
    been to the restaurant some hours before the commission of the
    crime but neither had engaged in a cash transaction.*

Appeal from Kent, John T. Letts, J. Submitted
Division 3 May 11, 1972, at Grand Rapids. (Docket
No. 10466.) Decided May 22, 1973.

John Daniel Ketzner, Jr., was convicted of first-
degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *James K. Miller,*

Prosecuting Attorney, and *Donald A. Johnston, III,* Chief Appellate Attorney, for the people.

John Daniel Ketzner, Jr., *in propria persona.*

Before: R. B. BURNS, P. J., and HOLBROOK and O'HARA,* JJ.

O'HARA, J. I agree with Judge HOLBROOK that a jury-submissible case was made by the testimony and exhibits in this case. Fact issues were created and submitted to the jury under a proper charge requiring proof of the defendant's guilt beyond a reasonable doubt. I find no basis for disturbing the jury's verdict of guilty.

As to the claimed legal errors, all of them are within the purview of MCLA 769.26; MSA 28.1096; and GCR 1963, 529.1. The Supreme Court recently held that the statute and court rule are "different articulations of the same idea". *People v Robinson,* 386 Mich 551, 562 (1972). That articulation is:

"No judgment or verdict shall be set aside or reversed or a new trial be granted * * * in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, * * * unless * * * it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice." MCLA 769.26, *supra.*

As mandated by *Robinson, supra,* and the statute itself, I have reviewed the whole record. I cannot find any suggestion that the defendant here did not have a fair trial or was in anywise denied due process. I am mindful in so holding that *Robinson* reaffirms what has always been the law of this state that the statute and its corollary

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

court rule are not cure-alls for error and both must be applied within constitutional limitations. I have considered the constitutional limitations and I do not find that they have been violated as to the defendant herein.

Affirmed.

R. B. BURNS, P. J., concurred.

HOLBROOK, J. *(concurring)*. Defendant John Daniel Ketzner, Jr., was convicted in a jury trial of first-degree murder in violation of MCLA 750.316; MSA 28.548. He was sentenced to life imprisonment. He filed a motion for a new trial which was denied in trial court and has now taken this appeal as of right. The pertinent facts in the case are as follows.

At approximately 8:00 p.m. on the evening of January 22, 1970, defendant John Daniel Ketzner, Jr., and his wife Patricia arrived at the Red Coach Inn at 401 Leonard, NW, in the City of Grand Rapids. Defendant was unemployed; however, he was a former Red Coach employee and he could still "charge" his meals and drinks at that establishment. Defendant and his wife entered the restaurant and proceeded downstairs to a room called the Village Pub where they ate dinner and had several rounds of drinks. Mrs. Sandy Gail Seyfarth, the waitress who served defendant until she was relieved at about midnight, recalled that defendant did not pay cash for anything but "ran a tab" on everything he and his wife ordered.

Shortly after 11 p.m., Patricia Ketzner left the restaurant and returned home. Defendant, however, remained at the Red Coach until after closing time. After his wife departed, he moved over to the piano bar where he and a customer named Larry Glen Winnie passed the next few hours with

off-duty waitresses Christine Brown and Loretta Stocking by playing the piano and singing. Defendant was especially solicitous of Miss Stocking; he ordered several drinks for her, insisted that she sit with him and asked her to join him for an early breakfast after "last call", which invitation she politely declined.

When bartender Christopher Schaffner announced "last call" at shortly before 2 a.m., defendant ordered a final round of drinks. He was then presented with his bar tab by Miss Beverly Mae Brady, who had relieved Mrs. Seyfarth as defendant's waitress sometime after 10 p.m. Defendant asked her if he could "sign it" and, after clearing it with Mr. Schaffner, Miss Brady replied that he could. Defendant thereupon signed his tab and told Miss Brady he would write in a $5 tip for her if she would return $2 of it in cash to him. Miss Brady complied with this request and when she returned with his two one-dollar bills, defendant asked her to purchase him a package of Pall Mall cigarettes out of one of them. Once again, Miss Brady followed defendant's instructions and, not realizing that there was a cigarette machine in the nearby Wine Cellar because she normally worked in the upstairs dining rooms, she went all the way upstairs to purchase the cigarettes defendant requested.

After signing his tab and receiving his cigarettes from Miss Brady, defendant stood up and said something like "about time to go home" or "well, I might just as well go home, call a cab and go home". He then picked up his hat and coat and "started for the exit, toward the north side of the building where the door is that you go out". He did not, however, walk all the way over to that door, nor did he exit through it. Instead, as Miss

Stocking clearly recalled, defendant walked past where she was sitting "and then he went around the corner of the bar into the back room" at about 2:15 a.m. Miss Stocking did not think anything of the fact that defendant went into this back storage room because, as she testified, "I knew he had worked there at one time and I figured he was going to say good night to somebody". That was the last time defendant was seen that morning by anyone in the Red Coach Inn. Neither Miss Stocking nor any of the other patrons and employees of the Village Pub room ever saw him emerge from the back storage room. Everyone *assumed* that he had carried out his pointedly announced intention of going home.

Shortly after defendant disappeared into the back storage room, Mr. Winnie, who was still seated at the piano bar, turned to Miss Brown and asked her if she could get him some cigarettes. Miss Brown indicated that she could and, knowing that there was a cigarette machine located in the nearby Wine Cellar, she proceeded to that location and purchased a pack of the brand requested by Mr. Winnie. While in the Wine Cellar, Miss Brown noticed that the cigarette machine was well lighted and that the room itself was further illuminated by two or three "hanging lights". She definitely remembered that neither defendant nor anyone else was present in the Wine Cellar during the time she was there purchasing cigarettes.

Miss Brown returned to the Village Pub and handed Mr. Winnie his cigarettes. Relating the time sequence of defendant's departure to the purchase of his cigarettes by Miss Brown, Mr. Winnie testified, "I did not see him [defendant] leave at all. In fact, I really don't recall him leaving the piano bar. I do know that when Chris

[Miss Brown] went to get my cigarettes, that at that time I noticed he [defendant] was gone." As soon as Mr. Winnie received his cigarettes, Mr. Schaffner told everyone that it was time to close and Mr. Winnie thereupon got up and left, returning directly to his home in Jenison. It was then approximately 2:25 a.m.

The others left at that time also but Miss Stocking and Miss Brown waited outside for Mr. Schaffner and his assistant, Charles F. Avery, who was being "broken in" as a new bartender that night, so they could all have breakfast together at Russo's Italian Restaurant on nearby Bridge Street. Mr. Schaffner and Mr. Avery then finished the job of closing the restaurant inside. They secured the evening's cash receipts in the "usual place" on the bottom shelf of a little cabinet behind the bar and began turning off the lights and locking doors. In the process, they found the Wine Cellar, as had Miss Brown a few minutes earlier, well lighted and unoccupied by anyone, including defendant. They also locked the door of the back storage room from the outside so that anyone on the inside would be locked in at least until Gerald Gordon Dudley, the night janitor, opened the room to obtain cleaning supplies as he did each morning.

Mr. Schaffner and Mr. Avery then locked all the outside doors and proceeded on their way to breakfast at Russo's with Miss Stocking and Miss Brown. On their way out they said good night to Mr. Dudley, a young family man, then 27 years old, who worked as the night clean-up man at the Red Coach. He had left his pregnant wife and young child at 11 p.m. to go to work that night, just as he did every other working night. When Mr. Schaffner and Mr. Avery left him at sometime between 2:30 a.m. and 2:45 a.m., Mr. Dudley was

working in the kitchen upstairs, not having gone
down to clean the Village Pub as yet. With all of
the outside doors secured, they left him locked
inside the Red Coach. That was the last time
Gerald Gordon Dudley was seen alive.

At approximately 6:55 a.m., Father Pedro Garcia
of St. Andrew's Cathedral in Grand Rapids was
awakened by a telephone call from defendant
Ketzner. Defendant indicated that he wanted to
see Father Garcia right away and that he thought
he had just witnessed a murder. Father Garcia
told him to come directly to St. Andrew's rectory,
located at 267 Sheldon, SE. Defendant agreed to do
so and met the priest at the rectory at about 7:25
a.m. At this point, defendant related for the first
time his version of the events which had tran-
spired earlier that morning at the Red Coach Inn.

Defendant told Father Garcia that while drink-
ing in the Village Pub room of the Red Coach that
morning, he had become sleepy along toward last
call. Accordingly, he got up and walked into the
Wine Cellar, put his head down on a table and fell
asleep. At about 4 a.m., defendant continued, he
was awakened by the sound of the vacuum cleaner
being operated by Mr. Dudley in the Village Pub.
Looking out from the Wine Cellar, he saw Mr.
Dudley hard at work cleaning the Village Pub
floor. Realizing that he had slept right through
closing time, defendant became frightened and
withdrew back into the Wine Cellar.

While defendant stood silently in the Wine Cel-
lar, Mr. Dudley went back upstairs for a few
minutes. When he returned to the Village Pub,
Mr. Dudley was, according to defendant's story,
accompanied by an unknown man. From his van-
tage point, defendant said that he observed Mr.
Dudley walk around behind the bar with the man

closely following him. After rummaging around behind the bar for a few moments, Mr. Dudley and the man left the room and defendant indicated that he assumed they proceeded back upstairs, although he did not actually see them going up the steps. Defendant explained that he then, for some unexplained reason, decided to follow them upstairs. He proceeded upstairs to the Greenwich Room and, seeing no one there, hid behind the bar in that room to await further developments.

The next thing he perceived, defendant related, was the sound of what he believed to be running water in the kitchen. Walking cautiously into the kitchen to investigate further, defendant stated that he saw Mr. Dudley half standing and half leaning over the sink and discovered that the sound he had heard was not running water but was blood gushing from Mr. Dudley's slashed throat and into the sink. Moments later, he saw Mr. Dudley slump to the floor and fall over on his back. Defendant stated that he then left the kitchen for a minute or two to collect his thoughts and then returned to where Mr. Dudley was lying, stooped down over the body and, holding his gloves in one hand, felt Mr. Dudley's pulse with the other. Feeling no pulse, defendant said that he concluded Mr. Dudley was dead and he turned and ran out of the building.

Defendant was then taken to police headquarters so that he could be interviewed by homicide squad detectives.

Before they arrived at police headquarters, however, officers were rapidly dispatched to the Red Coach Inn. These officers found the restaurant locked but Mr. Edward Harvey Wilson, manager of the Red Coach, arrived shortly and admitted them. In the kitchen, they found the body of Mr. Dudley

with a large, kitchen-type bread knife plunged
deeply into his throat. The body was dressed in an
overcoat and Mr. Dudley's hat was found in the
sink. The receiver was off the hook and dangling
from a telephone near the body. Further investiga-
tion at the Red Coach revealed that some glasses
had been knocked off a shelf and broken near the
door opening from the back storage room into the
Village Pub, indicating a possible struggle at that
location. The money placed on the bottom shelf of
the little cabinet behind the bar by Mr. Schaffner
was missing. Mr. Wilson indicated that during the
time defendant worked at the Red Coach, he had
become acquainted with the fact that the Village
Pub proceeds are kept in this location each night.

Dr. Gerald Barofsky, Deputy Kent County Medi-
cal Examiner, arrived at the Red Coach at approx-
imately 8:45 a.m. and examined the body. Follow-
ing his initial examination, he ordered it removed
to Butterworth Hospital where an autopsy was
performed by Dr. Peter VanVliet later that day.
These doctors discovered that Mr. Dudley had
been nearly decapitated by the bread knife and
concluded that he died from exsanguination within
a few heartbeats—not more than 18 or 20 seconds
—of the time at which the wound was inflicted.

Meanwhile, defendant was retelling his version
of how the murder was committed, this time to
homicide squad detectives. In successive inter-
views, defendant's story was eventually reduced to
three stenographically transcribed statements
which were subsequently, in edited form, received
into evidence at trial as people's exhibits 49, 51
and 56A. At the conclusion of these interviews,
defendant was arrested. Once they began inter-
viewing those persons who had been in the Village
Pub with defendant the previous night, these de-

tectives discovered a major discrepancy between their statements and those of the defendant; they discovered that defendant had not gone into the Wine Cellar at last call as he said he had done but he had instead, gone into the back storage room from which no one saw him emerge subsequently.

Another significant development occurred when at some time between 11:45 a.m. and 5:45 a.m. on January 23, 1970, someone deposited a quantity of currency in the mailbox at the corner of Jefferson and Morrison Streets in the City of Grand Rapids. A money wrapper on the bills was clearly marked as being from the Old Kent Bank and Trust Company branch located at the corner of Front and Bridge Streets and stamped with the date January 22, 1970. This is the bank branch at which the Red Coach banking was done and a quantity of currency had been obtained from that branch for use at the Red Coach on the morning of January 22. When the bills were subjected to silver nitrate treatment, the finger prints of Peggy Holmes, a Red Coach Inn employee, and Patricia Ketzner, wife of the defendant, were positively identified on several of them. Further investigation disclosed that Mrs. Ketzner had engaged in no cash transactions with the Red Coach at any time during January 22, or 23, 1970.

During his initial January 23 interview with detective Hawley, defendant Ketzner, in response to a question, indicated that the gloves he had with him at the time were the same ones he had been wearing earlier at the Red Coach Inn. Defendant was not asked to surrender these gloves but he voluntarily turned them over to detective Hawley. When defendant was transferred to the Kent County jail later that day, he was asked for his clothing which he voluntarily removed and

handed to a deputy sheriff, who then supplied him with jail attire. The gloves, people's exhibit 54 and defendant's shoes, people's exhibits 55a and 55b, and coat, people's exhibit 60, were all examined for traces of blood. All were found to be stained with human blood and the blood on the gloves was found to be type B. Type B blood was also found on people's exhibit 43, the murder weapon. The blood of murder victim Gerald Gordon Dudley was also type B; that of defendant Ketzner is type A.

At trial it was the people's theory of the case that defendant had deliberately secreted himself in the back storage room at closing time, knowing from his experience as a former Red Coach employee that he would be locked into this room by the night bartender and then released when the janitor was ready to start cleaning the Village Pub sometime later. That when Mr. Dudley unlocked this door, he was attacked by defendant and overpowered in the ensuing struggle, evidenced by the broken glasses in the doorway area. That Mr. Dudley retrieved the money from behind the bar at defendant's orders and then, perhaps, because defendant intended to take him as a hostage, went upstairs with defendant and put on his coat and hat. That at this point, Mr. Dudley broke away from defendant and attempted to telephone for help but was caught and killed by defendant before he was able to do so.

The defendant's theory of the case was to the effect that another unidentified man was also present in the Red Coach Inn that early morning and committed the crime, that the defendant did not see the crime committed because he was not in the room with the unidentified man and Mr. Dudley when the criminal act took place. In substantiation of this theory the defendant relies on the

contents of his statements given to the various police officers which accounted for his activities during the evening before and on the morning of the crime. It was also the claim of the defense that the people's theory of the case was not substantiated by the evidence.

1. Defendant on appeal claims that defendant's gloves, shoes, coat, and clothing were illegally seized and should not have been admitted at trial.

This issue was raised for the first time on this appeal. No motion to suppress was filed before trial and no objections were made to the admission of the articles at trial. This issue has not been preserved for appeal. *People v Duerson,* 35 Mich App 223 (1971); *People v George Martin,* 31 Mich App 624 (1971); *People v Ferguson,* 376 Mich 90 (1965).

Defendant further claims that failure to file a motion to suppress by his trial counsel was an act of incompetence. This claim is not tenable. The evidence discloses that the defendant gave his gloves to the officer voluntarily. The gloves were the only article with blood on them that matched the blood type of the deceased. The evidence concerning blood on other clothing was consistent with defendant's claims. This Court does not second guess trial counsel's strategy and tactics.

2. Defendant asserts error because the kitchen help were not indorsed as res gestae witnesses on the information. Defendant claims that it was important to question them so that it could be determined where the murder weapon was kept.

There was no showing by the defendant that these witnesses were res gestae witnesses, and further assuming they were, the failure to move for their indorsement at trial by defendant precludes the issue being considered on appeal for the

first time. *People v Hutson,* 25 Mich App 109
(1970).

3. This issue is without merit for the reason that
the record discloses that defendant's claims are
unfounded.

4. Did the prosecutor perpetrate reversible error
by allowing a witness for the people to make
improper statements through the use of defend-
ant's out-of-court statement?

A pertinent statement is contained in plaintiff's
exhibit 56 concerning a portion of defendant's out-
of-court statement:

*"Q. [Mr. Nykamp, assistant prosecuting attorney]:*
When you took his pulse was he on his back?

*"A. [Mr. Ketzner]:* He had eased himself down and
was lying on his back.

*"Q.* When you saw him the first time do you think he
saw you?

*"A.* I don't know.

*"Q.* Three people, one who did not work there, went
in the wine cellar and no one was in there. You were
not in there.

*"A.* I went into the wine cellar and fell asleep. If not,
where was I.

*"Q.* You tell us. In the furnace room, the locker room.

*"A.* If these people were in the bar running around,
where would I be.

*"Q.* In the locker room. A girl didn't think too much
of it, never thought of it again until this occurs. She
saw you go back there.

*"A.* I don't remember it.

*"Q.* I know for sure you were not in the wine cellar.
Of that I'm positive.

*"A.* I remember distinctly going in there and I re-
member waking up in there.

*"Q.* Maybe, but when they closed the doors, you
weren't there. The bartender and new bartender were
going through the ritual of closing and you weren't
there.

"*A.* I went in there, it's not a mistake, I told you the truth what I remember.

"*Q.* Three people say you weren't in there.

"*A.* I remember going in there."

The officer was attempting to show defendant that other witnesses did not agree with him as to where he stated he had been that early morning. The purpose was an effort to illicit an answer as to his whereabouts consistent with the information given by other witnesses who were present at the time.

Certain deletions were ordered by the trial judge of these statements and these remarks may have been ordered deleted but they were still read to the jury. It would have been better practice to have deleted the now-objected-to portion of the statement in question. However, it appears that the statements were obviously not prompted by the officer's personal knowledge but based upon information given him by other witnesses who were present at the time.

This claimed error did not amount to reversible error. 5 and 6. Did the trial court commit reversible error in admitting into evidence testimony concerning tests conducted by the prosecution, and did the trial court commit reversible error in its instructions to the jury concerning such testimony?

These two issues are best treated together. The police detective testified as to certain experiments which were conducted to determine if it were possible to hear blood (or water) running into the sink in the kitchen from the location from which defendant said he heard such sound on the night of the killing. No objection was made when the testimony was originally given.

On the next day, on cross-examination of the

detective, defense counsel brought out that the detective could not be sure that anyone actually did pour the water since he couldn't be in both rooms at once. Defense counsel thereupon moved that the testimony regarding the experiments be stricken from the record on the basis of hearsay. Counsel also objected on the basis of failure to set a proper foundation. The court denied the motions subject to the prosecutor linking up the testimony.

The prosecution thereafter moved for the indorsement of Richard Kloote, who helped with the experiment, and defense counsel indicated he had no objection. The court thereupon *sua sponte* excused the jury and indicated that he had grave reservations whether Kloote's testimony should be admitted. The court *sua sponte* refused to allow any additional testimony concerning the experiment. The jury returned and the court instructed the jury in the following manner:

*"The Court:* Ladies and gentlemen of the jury: The court has taken cognizance of the fact that certain tests were made after the jury was at the scene of this incident observing the grounds, and these tests were run by the prosecutor and members of his staff as to the carrying of sound under conditions which the court feels would not simulate the conditions at the time of the incident. On the court's own motion, it has restricted this testimony by eliminating that testimony, the latter testimony, primarily because of the reasons I have stated, that the same conditions could not possibly be simulated as were there at the time of the incident. And not only that, the court is of the opinion that to allow that testimony to come in would give this jurist and the court, itself, an aura of participating in the investigation that was carried on after we left. The court has some feeling that it might be somewhat unfair and it is not admissible and, therefore, I am not allowing that testimony to go in."

In its charge to the jury regarding this experiment, the court instructed: "You are instructed that tests and experiments of this nature must be weighed and considered in light of all other testimony in the case." Defense counsel objected because the court failed to give its requested instruction No. 7, in its entirety, which was:

"During the course of this trial, testimony has been admitted concerning certain tests that were carried out by the Grand Rapids police department, particularly, Officers Jack Hawley and Robert Winters concerning the ability to hear noise in the kitchen of the Red Coach Inn from a position behind the bar in the Greenwich Room on the main floor of the restaurant. You are instructed that the tests and experiments of this nature must be weighed and considered in light of all other testimony in the case. Unless such tests and experiments duplicate exactly the conditions that existed in the Red Coach Inn in the early morning hours of January 23, 1970, such evidence is of little value in establishing proof beyond a reasonable doubt as to the exact events that occurred in that restaurant during the early morning hours of January 23, 1970. You should consider the evidence and testimony admitted concerning these tests and experiments in this light and should evaluate and give weight to this testimony only in relationship to the extent to which the tests and experiments duplicate the conditions that did, in fact, exist in the restaurant on the early morning hours of January 23, 1970."

While the trial court only gave the first two sentences of the requested charge in its charge to the jury, the remaining portion of the requested charge was already encompassed in the prior instruction to the jury. Since the prior instruction indicated to the jury the fact that such experiment was of little value if based upon different conditions and in fact the court told the jury that the

conditions were different, the tenor of the proposed instruction was fulfilled.

No reversible error was committed as to these two issues.

7. Did the trial court err in instructing the jury on the felony-murder rule?

The defendant does not challenge the main instructions on murder. He did object to the supplemental charge on felony-murder which is as follows:

> *"The Court:* Ladies and gentlemen: In my instructions to you regarding the possible verdicts, and in my mention of the premeditated killing being one of the elements for a finding of first degree murder, I should also have included that a statutory felony, such as robbery, being one of the elements of first degree murder. If a person enters in upon an act in which murder results, and the act of robbery is part of it, that also is grounds for first degree murder, being a statutory felony."

The supplemental charge on felony-murder when read together with the main charge on murder properly instructed the jury on felony-murder.

8. Did the prosecutor in his closing argument to the jury make prejudicial remarks which were not supported by the evidence?

These remarks were in reference to an inference claimed to be justified by the testimony. Also defense counsel made only this single objection to the closing argument of the prosecutor and only asked that the prosecutor be instructed to refrain from such argument in the future. There was no request for a mistrial or for a curative instruction. The claimed error is not preserved for appeal. *Koepel v St Joseph Hospital,* 381 Mich 440 (1968).

9. Was the presence of an armed guard at the

defense table during the final stages of the trial prejudicial to the defendant because the jury could draw the inference that the defendant was, in fact, guilty?

In his appellate brief, defendant Ketzner contends that the presence of an armed guard at the defense table during the defendant's closing argument and the trial court's jury instructions was "prejudicial" to the defendant because the jury could draw the inference from the guard's presence that the defendant was, in fact, guilty. Defendant Ketzner first raised this issue at his sentencing and Judge Letts responded as follows:

"I was not aware of it, and I am not so sure. There was no order for that sort of thing, *except it was suggested,* I don't mind telling you as *I told the officers at the time,* that the court was somewhat fearful of the fact that, after watching you throughout the entire trial, that there was a possibility that you might become disturbed to the point that you might participate in some act which would be detrimental to the decorum of this court. And perhaps for that reason someone might have sat there." (Emphasis supplied.)

Since every person charged with a crime, whether it is a felony or a misdemeanor, is entitled to a fair and impartial trial, an accused person should *not* be subjected, before conviction, to any conduct which would inflame the passion or prejudice of the jury against the accused. However, trial courts are entitled to take all reasonable precautions to maintain order during a trial and to ensure the detention and custody of the accused. *State v Daniels,* 347 SW2d 874 (Mo, 1961), *cert den* 369 US 862; 82 S Ct 951; 8 L Ed 2d 19 (1962).

The claimed error is unmeritorious because (1) defendant Ketzner was on trial for murder; (2)

there was just one unobstrusive officer at the defense table and; (3) the trial court had good reason for believing the presence of the armed guard was necessary.

10. Were people's exhibits 57–59, 69–70, and 74–86 remote and speculative evidence, and, therefore, inadmissible at defendant's trial?

The sole question raised on this issue is whether the exhibits relating to the money which was found were sufficiently connected with the defendant and the crime to warrant their admission at the trial. The cases cited by defendant relating to the question of whether a fingerprint alone on an object is sufficient to convict beyond a reasonable doubt are not applicable to the instant case. Obviously the question of whether there is proof beyond a reasonable doubt is quite different from whether there is a sufficient connection to warrant admission of evidence at trial.

Defendant would have this Court hold that there must be independent proof that the money found in the mailbox was that taken from the restaurant. It would not appear, however, that such independent identification is necessary for admission of the evidence. The identification of a fingerprint of one of the restaurant employees and the palm print of defendant's wife on the money created a sufficient link with both the restaurant and the defendant to warrant its admission. While the connection was tenuous, it would appear that it goes to the weight to be accorded such evidence, rather than the admissibility of the evidence, and therefore the evidence was admissible.

11. Was the defendant denied due process of law because the jury verdict was not supported by sufficient evidence to convict beyond a reasonable doubt?

Defendant by way of his appellate brief admits that there was sufficient evidence to show that deceased's death resulted from a robbery. Defendant also admits, as he did below, that he was at the situs of the crime at the time of its occurrence. The only question is whether the prosecution offered sufficient proof to justify the jury finding that it was defendant who committed the robbery and murder. It would appear that the prosecution rebutted a major aspect of defendant's story of that night's happenings, *i.e.,* that he fell asleep in the Wine Cellar, whereas the witness said defendant went to the storage room. While showing that defendant's exculpatory statements are false is not sufficient to prove that defendant committed the crime, see *People v Johnson,* 4 Mich App 205 (1966), the substantive proof submitted by the people as related in the facts of the case herein, the improbability of defendant's story, when coupled with the admittedly tenuous link to the money, provides sufficient evidence to send the question to the jury and support the jury's finding.

Affirmed.